ROB BONTA
Attorney General of California
WILLIAM C. KWONG
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR
Deputy Attorney General
State Bar No. 263293
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-4435
  Fax:  (415) 703-5843
  E-mail:  Nasstaran.Ruhparwar@doj.ca.gov
*Attorneys for Defendant*
*M. Valdez*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| **KEFVON JEROME CAMP,**<br><br>Plaintiff,<br><br>v.<br><br>**R. RODRIGUEZ, et al.,**<br><br>Defendants. | 1:24-cv-04771-RMI<br><br>**DECLARATION OF NASSTARAN RUHPARWAR IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:      The Honorable Robert M. Illman<br>Trial Date:  Not set<br>Action Filed: August 6, 2024 |

I, Nasstaran Ruhparwar, declare:

1.      I am Deputy Attorney General in the California Attorney General's Office, counsel of record for Defendant Pantoja.  I am competent to testify to the matters set forth in this declaration and, if called upon by this Court, would do so.  I submit this declaration in support of Defendant Valdez's motion for summary judgment.

2.      Attached as **Exhibit A** are true and correct copies of excerpts and Exhibit 2 from Plaintiff's deposition taken on May 8, 2025.

//

//

1

Ruhparwar Decl. ISO Def.'s Mot. Summ. J. (1:24-cv-04771-RMI)

1    I declare under penalty of perjury that I have read this document, and its contents are true

2  and correct to the best of my knowledge.

3    Executed on this 30th day of July 2025, in San Francisco, California.

4

5    /s/ Nasstaran Ruhparwar
     NASSTARAN RUHPARWAR

6

7

8  SF2024402768

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

Exhibit A

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      EUREKA DIVISION

4                        --o0o--

5   _____ )
                                )
    KEFVON JEROME CAMP,         ) VOLUME 1 OF 1
6                               )
         Plaintiff,             ) Pages 1 - 77
7                               )
         vs.                    ) Case No. 1:24-CV-04771-RMI
8                               )
    R. RODRIGUEZ, et al.,       )
9                               )
         Defendants.            )
10  _____ )
                                ) Deposition Via Videoconference
11  And Related Actions.        )
    _____ )
12                              )
                                )
13                              )
                                )
14

15          DEPOSITION VIA VIDEOCONFERENCE OF

16                 KEFVON JEROME CAMP

17

18              Thursday, May 8, 2025

19

20

21                 Reported By:

22        Naomi S. Alvarez, CSR #13007

23

24

25



```
 1                            APPEARANCES:

 2

 3    In Propia Persona:      By: KEFVON JEROME CAMP, BC7449
                              4001 King Avenue
 4                            Corcoran, CA 93212

 5    For the Defendant       Attorney General of California
      M. Valdez:              By: MS. M. MAKI O'BRYAN, ESQ.
 6                            By: MS. NASSTARAN RUHPARWAR, ESQ.
                              455 Golden Gate Avenue,
 7                            Suite 11000
                              San Francisco, CA  94102
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1   We will serve a document request on you just to get

2   those exhibits after the deposition.

3        A.    Okay.

4        Q.    I am going to share my screen again.

5              I am showing you your first amended complaint

6   which is ECF number eight.  I will refer to this

7   complaint as your complaint today.

8              Does that work?

9        A.    Yes.

10       Q.    Great.

11             At which facility were you housed on

12  January 27, 2024?

13       A.    I was at California State Prison Salinas

14  Valley in C Unit, cell -- I forgot my cell number.  109

15  or 108.

16       Q.    Did you receive a rules violation report on

17  January 27, 2024?

18       A.    Yes.

19       Q.    And did you receive a copy of the rules

20  violation report?

21       A.    Yes.

22       Q.    When did you receive that?

23       A.    I don't know the exact day I received it.  I

24  know they did bring me a copy within a week.  Probably

25  on March 4th.



1    Q.   How did you receive the report?

2    A.   One of the -- what do you call them?  The

3  dispo officer or S&E dispo officer.

4    Q.   Were you able to read the report?

5    A.   Yes.

6    Q.   And who issued the rules violation report?

7    A.   Sergeant Rodriguez.

8    Q.   What did Sergeant Rodriguez write in the rules

9  violation report?

10    A.   Sergeant Rodriguez stated that he came out to

11  yard, he gave us a direct order to return back to our

12  cells, our housing unit, and that we refused to comply.

13    Q.   Did Sergeant Rodriguez cite any evidence in

14  the rules violation report?

15    A.   Yes.  He said there was video footage.

16    Q.   Do you know what kind of footage that was?

17    A.   BWC, body watch worn camera and a number next

18  to it.  That would be the body cam that he had on that

19  day, supposedly.

20    Q.   Do you know what the footage showed?

21    A.   Yes.  The footage showed the inmate on the

22  opposite side of the building going back and forth in

23  his cage refusing orders to return back to his housing

24  assignment.  And that inmate was not me.

25    Q.   And how do you know what the footage showed?



1      A.   I seen it at the 115 hearing.  Without the

2  hearing, the officer came down the tier.  I can't

3  remember this officer's name.  He is another dispo S&E

4  officer.  He comes around and asks you if you want to

5  review the footage from your 115 hearing.  All six of

6  us, we all reviewed the footage and we all seen that it

7  was the inmate and that was neither of us.

8      Q.   When did you view the footage?

9      A.   That would be sometime in March.  I don't know

10  the exact date.  I don't want to put a wrong date on

11  the record.  It's sometime in March, though, I seen the

12  footage.  February.  Sometime in February I seen the

13  footage.

14          Ma'am, February, not March.  February.  The

15  incident happened on January 27th.  I would have gotten

16  my first copy like around the 4th or the 5th of

17  February.  I seen the dispo officer probably like

18  around the 14th or 15th of February.

19      Q.   Great.  I appreciate you estimating the

20  timeline.  I am going to share my screen again.

21      A.   Okay.

22      Q.   Mr. Camp, can you see my screen?

23      A.   Yes.

24      Q.   I am marking the RBR evidence review from

25  January 31, 2024, as Exhibit 2.



```
1              (Whereupon Defendant's Exhibit 2 was marked
2               for identification.)^
3    BY MS. O'BRYAN:
4         Q.    Mr. Camp, have you seen this document before?
5         A.    No.  I had to.  I signed it.  I probably
6    wasn't paying attention to it.
7         Q.    Can you tell me what document this is?
8         A.    I can't tell you what document it is, but I
9    know that I signed it.
10        Q.    Do you know what a CDC 128(b) form is?
11        A.    A 128(b) chrono, yeah.
12        Q.    What is a 128(b) chrono?
13        A.    128(b) chrono is stating that you were made
14   aware of your rules violations and you had a chance to
15   go over the evidence.
16        Q.    What does this document show?
17        A.    It shows that I signed saying I seen the
18   evidence that was presented against me.
19        Q.    What kind of evidence was that?
20        A.    The video footage.
21        Q.    Did you review the body worn camera footage?
22        A.    Yes.
23        Q.    When did you review the BWC footage?
24        A.    On the tier in my cell somewhere between the
25   4th and 15th of February, to the best of my
```



1   acknowledgement.

2       Q.   Mr. Camp, can you see the date that is on the

3   document?

4       A.   Yes.  It says January 31st.  One says

5   January 27th.  One says January 31st.

6       Q.   Do you know when you viewed the video footage?

7       A.   According to this document, it would be the

8   31st.

9       Q.   Is that your signature on this document?

10      A.   Yes, it is.

11      Q.   What was the footage you viewed on January 31,

12  2024?

13      A.   An inmate on the opposite side of our building

14  in his cage in the yard pacing back and forth refusing

15  direct orders to take him back to his housing

16  assignment.

17      Q.   What yard was that on?

18      A.   We are on the lower -- it's all in the Z unit.

19  It's from A wing all the way over to H row.  So from

20  A row to H row.  A, B, C.  E is on the left side of the

21  building.  The others are on the right side of the

22  building.  If he was on the right side of the module

23  where we never go to.  We never go to those cages over

24  there.  That is on the opposite side of the building.

25  You can see on the cage module when you look at the



KEFVON J. CAMP Vol. 1                          May 08, 2025
CAMP vs RODRIGUEZ, ET AL.                            21

1   video, you will see the number on there.  It never

2   reflects any number that they have documented of me

3   being in cages when we go out to the yard.

4       Q.   Why do you never go to that side of the yard?

5       A.   Because we have our own assigned cages on our

6   side of the building.

7       Q.   Do you know who is depicted in the footage?

8       A.   No.  I don't know the individual.

9       Q.   I'll come back to a few more questions about

10  the footage.  Right now I want to move on to questions

11  about the hearing.

12           Was there an RBR hearing?

13      A.   Yes.

14      Q.   On which date?

15      A.   I don't remember the exact date.  I know I was

16  on the yard and they didn't give us any warning.  They

17  just came out and was like, hey, do you want to go to a

18  115 hearing?

19      Q.   Who led the hearing?

20      A.   Lieutenant Valdez.

21      Q.   Where did the hearing take place?

22      A.   Inside the group room in C unit.

23      Q.   What did that room look like?

24      A.   It has five to six desks in there with, like,

25  a metal slab to separate each inmate.  It has a desk



1  remembers clearly.  I know he does.  That's the first

2  thing he said when I came into the room.  He said,

3  dude, are you okay?  Yeah, I'm okay.  You look like

4  you're feeling too good.  I want to plead guilty so I

5  can be out of here.  I don't want to be in here.

6       Q.   How do you know that Lieutenant Valdez knew

7  you were intoxicated?

8       A.   When he asked me, he said, you look like

9  you're feeling too good.  I said, yeah, I am but I'm

10  all right.  Are you sure?  I'm all right.  They have

11  video footage of this.

12            This should be in evidence, the video footage

13  of the hearing, AVS, the audio video surveillance

14  system.  They should have video of all of this.

15       Q.   Did Lieutenant Valdez explain the nature of

16  the hearing to you?

17       A.   Like telling me my rights or whatever or my

18  due process?

19       Q.   I'll rephrase.

20            Did Lieutenant Valdez explain why you were in

21  the group room in C unit?

22       A.   Yes.

23       Q.   What did he --

24       A.   He said I was here for an RBR rules violation,

25  disobeying a direct order from a correctional officer.



 1  canteen, 60 days of phone calls, and 60 days of

 2  packages.

 3      Q.   I am going to share my screen.

 4           Mr. Camp, can you see my screen?

 5      A.   Yes.

 6      Q.   I am marking the disciplinary hearing results

 7  as Exhibit 3.

 8                    (Whereupon Defendant's Exhibit 3 was

 9           marked

10                    for identification.)^

11           THE WITNESS:  There we go.

12  BY MS. O'BRYAN:

13      Q.   Mr. Camp, can you see the section marked

14  disposition?

15      A.   Yes.

16      Q.   Mr. Camp, I'm seeing that credit lost was

17  61 days.

18           Am I reading that correctly?

19      A.   Yes, ma'am.  61 days.

20      Q.   I am also seeing that canteen privileges were

21  lost for 61 days.

22           Am I reading that correctly?

23      A.   Yes, ma'am.

24      Q.   I'm seeing that phone privileges were lost for

25  61 days.



1              Am I reading that correctly?

2        A.    Yes, ma'am.

3        Q.    And then I am also seeing that yard recreation

4   privileges were lost for 61 days.

5              Am I reading that correctly?

6        A.    Yes, ma'am.

7        Q.    You previously mentioned that you also lost

8   packages privileges, but I'm not seeing that on this

9   disposition sheet.

10       A.    Yes.  Sorry.  I misspoke.  It was the 61 days

11  of credit loss.  That was the fourth thing.

12       Q.    No worries.

13             Have you seen this document before?

14       A.    Yes.

15       Q.    And when did you see it?

16       A.    When I got my first copy, my final copy.

17       Q.    Do you recall when that was?

18       A.    That day I got the final copy.

19       Q.    Do you know what this document is?

20       A.    You're saying do I know which document this

21  is?

22       Q.    Yeah.

23       A.    Yeah.  It's part of the final copy package.

24  It was after the whole 115 has been adjudicated.

25       Q.    I'm going to stop sharing.



1          We talked about how the credit loss was

2    61 days.

3          Was that loss of credits invalidated?

4    A.    By invalidate, you mean not necessary?

5    Q.    Was the loss of credits overturned, ever?

6    A.    They gave me -- for my 602 they told me they

7    were going to overturn it and they turned around and

8    gave me another one saying, no, they'll leave it the

9    same.  It never got overturned.  It never got taken off

10   my record.  It's still there.

11   Q.    Do you know what log number the 602 was for

12   when you said they said they would overturn the credit

13   loss?

14   A.    On your Exhibit A, it will be the third one

15   down.  Exhibit A has number one and number two and then

16   one that says OIA and it will be that one on the

17   amended --

18   Q.    Sorry.

19          Mr. Camp, when you say OIA, what are you

20   referring to?

21   A.    Office of internal affairs.

22   Q.    Does the office of internal affairs respond to

23   grievances?

24   A.    You have to send it up to that level.  Once

25   they denied my 602, I sent it to the OIA.



1        Q.    Mr. Camp, are you perhaps referring to the
2    OOA, the office of appeals?

3        A.    OOA, yes.  There you go.  Thank you.  OOA.

4        Q.    No worries.  I just wanted to clarify that.

5              Just to confirm, are you saying that OOA told
6    you they would overturn the credit loss and then never
7    did?

8        A.    Yes.  And I have that document in the cell.

9        Q.    Okay.  I'll come back to some questions about
10   your grievance activity.  For now, I just want to move
11   on and talk a little bit about your housing.

12             In which housing unit were you housed on
13   February 24, 2024?

14       A.    Salinas Valley restricted housing unit Z, cell
15   number 809.

16       Q.    From when to when were you in the restricted
17   housing unit?

18       A.    January 13th to March 20, 2024, at Salinas
19   Valley.  I've been in the restricted housing unit since
20   then.  I left there and came here on March 20, 2024.  I
21   still have another year to do back here.

22       Q.    Why were you housed in the RHU?

23       A.    I got caught with two weapons January 13th.
24   Possession of inmate-manufactured weapons.

25       Q.    How long have you been in RHU?



 1  privileges affected you in your day-to-day life?

 2      A.   Yeah.  Not being able to go outside.  I'm big

 3  on being stuck in my cell.  When I'm stuck in my cell,

 4  I tend to let my mind get the best of me.  If I think

 5  something is going on behind me back, I tend to

 6  overthink things a lot.  When I'm stuck in the cell I

 7  get caught in negative thoughts.  I'm a real people

 8  person.  I don't like being isolated or just stuck with

 9  myself.

10          I'm finding myself being -- the person that I

11  used to be, I always thought of violence a lot.  It's

12  all I thought about, that is what I conversated about.

13          As I change, I try to interact with people

14  more and find different ways to look at the positive

15  side of things.  Without that, I'm just stuck in my old

16  ways in the cell.  I need to be out of the cell as much

17  as I can to interact with people, for me.

18      Q.   All right.  I want to go back to some

19  questions about the body cam footage.

20          In your complaint you allege that the video

21  footage from Rodriguez's body cam should have shown

22  that you did not delay a police officer but that

23  Lieutenant Valdez ignored the evidence.

24          What, again, did that footage show?

25      A.   That footage showed an inmate on the opposite



1   side of the building pacing back and forth refusing

2   orders to be taken back to his inmate assigned housing.

3   He was out there by himself.  It wasn't multiple

4   people.  It was just him.

5        Q.   What is a yard module?

6        A.   That is the cages, the 15-by-8 cages that we

7   go to outside of the building.

8        Q.   Was this individual refusing to come out of

9   the module?

10        A.   Yes.  They were given direct orders to go back

11   to his cell assignment and he was refusing to.

12        Q.   Do you typically need an escort to go from the

13   module to your cell?

14        A.   Yes.  When you're in restricted housing unit

15   you never walk anywhere by yourself.  You're always

16   handcuffed and always escorted.

17        Q.   Was this individual refusing the escort?

18        A.   Yes.  He was refusing to cuff up to go back to

19   his cell.

20        Q.   And you testified he was just pacing in the

21   module?

22        A.   Yes.  He was just pacing back and forth.

23        Q.   Okay.  Just to confirm, do you know who this

24   individual is?

25        A.   No.  I never had any contact with this inmate.



1  other, J. Hargett.  Yes, I see it.

2      Q.   Were you served with a document on

3  February 2nd, 2024?

4      A.   Yes.  That would have been my first copy.

5      Q.   Do you know what the document was?

6           Could you repeat that?  I think the audio cut

7  out again.

8      A.   I believe it was my rules violation report

9  letting me know that I had a 115.

10     Q.   Right above that it says January 31, 2024,

11 inmate copy served, initial rules violation report.

12          Am I reading that correctly?

13     A.   Yes.

14     Q.   Were you served a copy of the RBR on

15 January 31, 2024?

16     A.   Yes.  That is the original copy, the first one

17 that they issued to you.

18     Q.   Was the document served to you on

19 February 2nd, 2024, the same thing?

20     A.   Yeah.  Basically the same thing.

21     Q.   Could it have been something else?

22     A.   The 27th.  The 31st was an inmate copy and

23 copy served other.  The second one would have been

24 after the hearing.  It would probably be the results.

25     Q.   I believe I'm reading hearing date



1                    REPORTER'S CERTIFICATION

2

3        I, Naomi S. Alvarez, a Certified Shorthand

4   Reporter in and for the State of California, holding

5   Certificate No. 13007, do hereby certify:

6

7        That the foregoing witness was by me duly

8   sworn; that the deposition was then taken before me at

9   the time and place herein set forth; that the testimony

10  and proceedings were reported stenographically by me

11  and later transcribed into typewritten form under my

12  direction; that the foregoing is a true record of the

13  testimony and proceedings taken at that time.

14        I further certify that I am neither counsel

15  for, nor in any way related to any party to said

16  action, nor in any way interested in the result or

17  outcome thereof.

18        IN WITNESS WHEREOF, I have subscribed my name

19  on May 14, 2025.

20

21

22  _____

23        Naomi S. Alvarez, CSR #13007

24

25



State of California
Department of Corrections and Rehabilitation
RVR - Evidence Review
CDC-128-B (4/74)

NAME AND NUMBER   *Camp  BC 7449*                                    HOUSING: *29-114*

RVR LOG: *7399674*                                    IRT LOG: _____

RVR Date: *1-27-24*

THE FOLLOWING ITEMS OF EVIDENTARY VALUE ARE BEING USED AS INCRIMINATING EVIDENCE AGAINTS THIS INMATE:

☐ PHOTOGRAPHS/PHOTOCOPIES OF INCRIMINATING EVIDENCE AGAINST THIS INMATE.

☑ VIDEO (AVSS/BWC) OF INCRIMINATING EVIDENCE AGAINST THIS INMATE.

☐ AUDIO CD'S OF INCRIMINATING EVIDENCE AGAINST THIS INMATE.

☐ OTHER: _____

ON THIS DAY, THIS INMATE WAS OFFERED THE CHANCE TO REVIEW THIS EVIDENCE PRIOR TO THE DISCIPLINARY HEARING.

THE INMATE  ☐ ACCEPTED | ☐ DECLINED TO REVIEW THE PHOTOGRAPHS   _____

ON _____ AT APPROXIMATELY _____ HOURS.   INMATE SIGNATURE

THE INMATE  ☑ ACCEPTED | ☐ DECLINED TO REVIEW THE AVSS/BWC   *X 1-C.P*

ON _____*1-31-24*_____ AT APPROXIMATELY _____*1020*_____ HOURS.   INMATE SIGNATURE

☐ THE INMATE REFUSED TO SIGN CDCR 128-B GENERAL CHRONO.

Orig: Central File
CC: Writer
Inmate

_____*J. Harrett*_____
Disciplinary Officer
Central Services
Salinas Valley State Prison

DATE: _____*1-31-24*_____

GENERAL CHRONO

(REVIEW OF EVIDENCE)

EXHIBIT
2